IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 3:06-CR-141 |
| | ) | (Phillips / Shirley) |
| MURPHY JOSEPH KING, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

All pretrial motions in this case have been referred to the undersigned pursuant to 28 U.S.C. § 636(b) for disposition or report and recommendation regarding disposition by the District Court as may be appropriate. This matter came before the Court upon Defendant Murphy King's Motion to Suppress Evidence [Doc. 9]. The government filed a response to the motion [Doc. 12]. The parties came before the Court for a suppression hearing on April 20, 2007. Assistant United States Attorney Tracy Stone was present representing the government. Attorneys Paula Voss and Kim Tollison were present representing Murphy King, who was also present. The Court took the suppression motion, exhibits and related filings under advisement on April 21, 2007.

## I. FACTS

This case arose from a call for assistance made April 23, 2005, from the home of defendant Murphy Joseph King near Rutledge in Grainger County. The call made to the E-911 center reported a stabbing and assault in progress. After the call, a series of events led police to discover and seize a number of long guns from the home. Mr. King was later charged with being

1

a felon in possession of these firearms. Mr. Kings' Motion to Suppress [Doc. 9] urges that the search which led to the seizure of these firearms was conducted in violation of the Fourth Amendment. The government asserts that the search was conducted pursuant to a valid arrest warrant, and the weapons seized were in plain view, and, further, that the officers were faced with exigent circumstances which would have justified the search nonetheless. Because the search was conducted without a search warrant, the government had the burden of production and persuasion. At the evidentiary hearing, the Court heard the testimony of three witnesses and received four exhibits into evidence. The facts adduced at the hearing were as follows.

## A. Emergency Communication Center (E-911) Call

Without objection, the first evidence presented to the Court as a recording of an E-911 call. The call was made by a man later identified as Ronald Trosper from a cell phone. Mr. Trosper told the E-911 operator that he had been stabbed and was bleeding heavily. Mr. Trosper reported that his brother, Murphy King, had stabbed him inside their house and had shot at him, and that Mr. Trosper had fled and was in the driveway, sitting in a position where he could not be seen from the house. He also reported that Mr. King fired a gun at him as he tried to escape. Mr. Trosper had great difficulty reporting his location by address to the E-911 operator, eventually making his way down to a mailbox where he gave the address 4253 Rutledge Pike. Mr. Trosper said that his shirt was bloody and that his brother was drunk. Mr. Trosper described the place as a log cabin with a trailer behind it. Mr. Trosper told the operator that Mr. King was still inside the house with a gun and that other people were inside the house, too. Mr. Trosper said that his mother, Mr. King's wife, and Mr. King's son were inside the trailer. In response to the E-911 operator, Mr. Trosper said that the other people were not drunk. The operator asked

Mr. Trosper if the defendant was still shooting and said, "Yes." She also asked what kind of guns were in the house. He described them as: two SKS .12 gauge and a .410. When asked what Mr. King shot him with, he said it was an SKS. At that point in the call, law enforcement arrives on the scene and Mr. Trosper hung up his phone. This concluded the E-911 recording evidence. The recording was accepted as Exhibit 1.

## B. Randy Holt

### I: Direct Examination

#### A. *Response to the E-911 Call*

After the E-911 recording, the government called two witnesses, the first was Randy Holt, Jr., an officer with the Grainger County Sheriff's Office. Officer Holt testified that he has been a deputy with the Grainger County Sheriff's Office for nearly eight years. Officer Holt said that on April 23, 2005, he was working and heard the police radio dispatcher first contact a Rutledge City officer to respond to a call. Officer Holt monitored the radio exchanges until he completed the call he was already on. Then Officer Holt went directly to 4253 Rutledge Pike to answer the call, he being closer than the nearest Rutledge City officer.

#### B. *Arriving at the Scene*

Officer Holt testified that he was the first responder on the scene. Officer Holt spotted the apparent caller, whose name he could not recall at the time of this hearing, but who he identified as "the victim" in describing the events. Officer Holt recalled that the victim said that his brother had stabbed him and shot at him and stated that his brother was still in the house with the latter's wife and mother. Officer Holt got the victim moved farther down the driveway, away

from the house.  Officer Holt testified that he was the only officer on the scene until Captain

Jason Johnson arrived.  Capt. Johnson was then employed by the Grainger County Sheriff, but

has since left the force.  Officer Holt testified that the Sheriff of Grainger County came to the

scene, as well.  Officer Holt testified that he did not speak to any family members on the scene

directly, and did not remember any other officers speaking to family members.

### C.  Obtaining an Arrest Warrant

Officer Holt testified that the Sheriff asked him to write an arrest warrant on the scene

and take it to the court clerk's house.  Officer Holt said that he did as directed.  Officer Holt

testified that he prepared an arrest warrant for aggravated assault, a felony, and drove to the

home of the clerk of the court, Rhonda Reagan.  Officer Holt testified that Ms Reagan, who has

authority to sign such warrants, signed the warrant.  Officer Holt testified that he identified the

person to be arrested as Joey King, but that he was in a hurry when he wrote it out on a printed

arrest warrant form.  Officer Holt identified a copy of an arrest warrant as being a copy of the

one he prepared and got signed on April 23, 2005; that document was then received as Exhibit 2

to the hearing.  Officer Holt testified that the other officers who remained at the scene, including

the Sheriff, were waiting on him to get the arrest warrant signed.  Officer Holt said there was a

lot of "radio traffic" concerning the impending arrest warrant and the Sheriff called to check on

the status of his efforts.  When the Sheriff radioed Officer Holt, he testified he was standing in

Ms Reagan's living room going over the material with the clerk.  Officer Holt said that the

Sheriff urged, "Let me know as soon as you have it signed."  Officer Holt testified that he

returned to the scene, that no entry had been made prior to his arrival and that he handed the

warrant to the Sheriff. Then the Sheriff gave the command to "make entry into the house." Officer Holt was not one of the officers who entered initially.

### D. What Happened to the Arrest Warrant

Officer Holt testified that the defendant was not located and arrested on that date, April 23, 2005. Officer Holt answered affirmatively when he was then asked, "Did eventually one of your superiors create a replacement warrant?" Officer Holt said that Capt. Johnson later got an arrest warrant for especially aggravated assault. The defendant was arrested on that warrant May 3, 2005. Officer Holt testified that his original arrest warrant was never served. Officer Holt testified that after he handed the arrest warrant to the Sheriff, he does not know what happened to it after that, although he did have some recollection that the Sheriff immediately handed the arrest warrant to Capt. Johnson.

### E. Search of the House

Officer Holt testified that he himself was not part of the entry team, but did go inside after the initial entry and search. Officer Holt testified that when he was inside, Mr. King was not present. He did see guns inside the house, and believed they were rifles. Officer Holt testified that he was not sure where he saw these guns, but then testified they might have been in a back bedroom.

## II. Cross Examination

### A. Response to the Call

Attorney Paula Voss then cross-examined Officer Holt, who testified as follows. Although Officer Holt was on another call immediately before he responded to this one, he did not remember what that call was. He could not say where the call took place, whether it was on

the same side of the county or what the nature of it was. Officer Holt could only testify that he was the closest officer to this call and that he "finished what I was doing" and went to this scene. Officer Holt could not say how long it took him to clear the earlier call before he could set out to respond to this call. Attorney Voss drew his attention to an Offense Report. On that report, Officer Holt himself had indicated that the event occurred at 19:47 and that he responded at 19:52, some five minutes later. Officer Holt testified that he still could not independently remember those times. This Offense Report, dated April 23, 2007, and authored by Officer Holt, was introduced as Exhibit 3 to the hearing.

### B. Initial Events at the Scene

Officer Holt testified that when he arrived, he found a man "sitting on the side of the road on a small bank." He stated Mr. Trosper was holding his left side and bleeding quite a lot, and reported the defendant had stabbed him and shot at him. Officer Holt told the man to move farther from the house, for safety, until the medics arrived. Officer Holt confirmed that the home in question was a mobile home and gave "a wild guess" that it sat about 150 yards from the roadway. Part of the view from the roadway to the house was obstructed by what Officer Holt described as "a small thicket," with a fence and some vines. Officer Holt helped the victim move out of the line of sight from the house, obstructed by this small thicket.

Officer Holt testified that Mr. Trosper was not wounded by a gun, but had been stabbed. When asked whether Officer Holt smelled an alcoholic beverage on Mr. Trosper, he replied that he does not now recall. Officer Holt said that he had his police communication radio on and that he was relaying information to others en route to the call. Officer Holt testified that he remembers telling the radio dispatcher that he needed a medic on the scene. After that about six

other police officers responded. Officer Holt testified that he does not know how long it was before the Sheriff arrived at the scene, but that it could have been 15 minutes to a half an hour later. During that time he heard no noise from the trailer. When the Sheriff arrived, he was in charge of the scene. Officer Holt testified that Capt. Johnson is no longer with the Grainger County Sheriff's Office because he quit when the new Sheriff was elected.

### C. Obtaining an Arrest Warrant

Officer Holt testified that the Sheriff had been on the scene about 15 minutes before he directed Officer Holt to go seek an arrest warrant. Officer Holt estimated it to be between 12 and 15 miles from the scene to clerk Rhonda Reagan's house. Adding together the estimates of time he had given during his testimony, Officer Holt agreed that it was "well over an hour, going on two hours" from his initial arrival on the scene until he returned to the scene with a signed arrest warrant. Officer Holt agreed with his report that the events started about 7:47 p.m., and that given the season he was on the scene about 30 minutes before "it started getting dusky." Officer Holt testified it would have been close to 10:00 p.m. by the time he returned to the scene with the arrest warrant.

### D. Officer Manis and Contact With the King Family

Attorney Voss asked Officer Holt whether he saw any movement from the trailer during that time, to which he responded that he did not. Officer Holt said that he did not see anyone come down to the roadway from the trailer and did not speak with any of Mr. King's family members.

When asked by Attorney Voss, Officer Holt testified that another Sheriff's deputy named Ronnie Manis was at the scene. Officer Holt reports that Mr. Manis is also no longer with the

Grainger County Sheriff's Office. Officer Holt testified that he does not recall Officer Manis entering the house. Officer Holt testified that he does not recall Officer Manis walking back down to the roadway from the direction of the house with Mrs. King and her son. When asked whether he recalled talking to Mrs. King that night, Officer Holt testified, "not to my knowledge."

### E. The Replacement Warrant and the Lost Warrant

Officer Holt testified that he does not know what happened to the arrest warrant he obtained that night. He confirmed his knowledge that Capt. Johnson took another warrant against Mr. King on May 3, 2005, for the same incident. See Exhibit 4. Officer Holt, in fact, signed the officer's return on the backside of this replacement warrant, indicating he had effected Mr. King's arrest. Officer Holt testified that he did arrest Mr. King on Capt. Johnson's warrant. Officer Holt described that he took a reserve officer along with him to Mr. King's property to attempt the arrest. At the suggestion of the reserve officer, Officer Holt remained in the cruiser while the reserve went into the woods near the house to speak with Mr. King. Officer Holt recalled that it was about 10 minutes later that the reserve officer cam walking out of the woods with Mr. King. They then took him to jail.

When asked by Attorney Voss, Officer Holt testified that when an arrest warrant is issued the clerk of the court should have a record of that warrant, that the Sheriff should have a record. Officer Holt agreed that even if the arrest warrant were unserved, it would still need to be on record with law enforcement. Officer Holt agreed that should an officer make a traffic stop or encounter a person on another matter, they must have a way of knowing whether a warrant for that person's arrest was outstanding. Officer Holt agreed that, as to the arrest warrant he

described getting on April 23, 2005, none of these things were true. When asked whether the Sheriff has had a copy of his warrant on file, Officer Holt replied, "Not to my knowledge." Officer Holt agreed that there was not a copy of the arrest warrant available at the courthouse. The two-page arrest warrant for Mr. King dated May 3, 2005, was introduced at Exhibit 4 to the hearing.

### F. Search of the House

Continuing his testimony on cross-examination, Officer Holt described the search of the house. When asked what the searchers were looking for, Officer Holt responded, "guns." Officer Holt said he helped with the search although he was not among the initial entry team. Officer Holt was not sure how the rest of the search was executed, but that he helped in the back bedroom search. When asked whether the police searched through all the belongings they found, Officer Holt said, "I don't recall."

### G. Additional Documents

Officer Holt testified that he brought with him to the hearing a copy of the communication center recordings from the night of April 23, 2005. Officer Holt said these would include the original E-911 call and excerpts from the police radio traffic that night. Officer Holt said that his recording did not have all the radio traffic, only "excerpts." Officer Holt testified about where these recordings are stored and the contact information for obtaining a copy. Officer Holt testified that he does not have a file on this incident.

### III. Re-Direct Examination

Upon re-direct examination, AUSA Stone approached Officer Holt with Exhibit 4 and asked him to identify some of its features. Officer Holt testified that the original warrant was

solely for aggravated assault, and the second warrant brought charges of evading arrest and especially aggravated assault. Officer Holt then testified that he brought with him to the hearing a document called a "CAD event." He agreed with the description of the "CAD event" as "all the stuff that dispatch has logged down about this incident." Officer Holt then reviewed the document for use of police codes or slang that might be explained for clarity. Finding none, he returned the exhibit to AUSA Stone. The CAD event was received as Exhibit 5 to the hearing.

## B. Andy Dossett

### I: Direct Examination

#### A. Background

The government's second witness was Chief Andy Dossett of the Bean Station Police Department. Chief Dossett testified that he has been in law enforcement for 10 years; the past six years at the Bean Station Police Department. Chief Dossett has been the Chief of Police some four and a half to five years. Chief Dossett testified that Grainger County includes about 24,000 to 25,000 people. Chief Dossett described a mutual aid agreement that his department shares with the Grainger County Sheriff's Office, which formed the background for the Sheriff's request for assistance on April 23, 2005.

#### B. Call for Assistance from Sheriff

Chief Dossett testified that the Bean Station Police Department has a swat team, which assembled at his request on April 23, 2005, because the Grainger County Sheriff's Office had requested swat support assistance at the scene of an investigation. Chief Dossett testified that he

and his team traveled to a community know as Joppa, located west of Rutledge on highway 11W
heading in the direction of Knoxville.


## C. Arrival at the Scene

Chief Dossett testified that "we were basically after the fact as a tactical team." When he
and his officer arrived, Chief Dossett talked to other police already on the scene. Chief Dossett
believes the victim was already gone from the scene to a hospital when Bean Station officers
arrived. Chief Dossett does not believe he spoke to any of the King family members, and that he
gathered information from law enforcement sources only, although he assumed it had originally
been provided by witnesses. Chief Dossett testified that it was the understanding of his swat team
that there was "a good possibility" that Mr. King was inside the mobile home. This was the
reason for the call for a tactical team, Chief Dossett said. Chief Dossett testified that the
information he received was that Mr. King was armed, had shot at the victim, and "had a high-
powered rifle." Chief Dossett did not see Mr. King on that day, nor did he hear any gunshots.
Chief Dossett recalled there were six or seven members of his team assembled.

Chief Dossett testified that he and his team staged themselves on 11W, just east of the
residence in preparation for entry. Initially, the team was staged together for information
gathering purposes. They stood there along with the Sheriff and other officers waiting for an
arrest warrant to be signed. Chief Dossett understood that one or two other officers had already
"formed a perimeter." When asked whether he learned any information that Mr. King might have
been seen leaving the trailer, Chief Dossett said that he did not. Chief Dossett testified that it was

his understanding, "they had guys on the way to get a warrant," and that they did not enter until the arrest warrant was obtained.

Chief Dossett testified that it was about 20 to 25 minutes from their arrival until the swat team received the order to enter the house. Chief Dossett testified that from the time he got the initial call for assistance from the Sheriff until he arrived on the scene about a half hour elapsed, give or take a few minutes. Chief Dossett said that he did not make any reports of these events, nor did any of his team members.

### D. Swat Team Entry

Chief Dossett testified that it was dark during his time at the scene. The Bean Station swat team first "cleared" what Chief Dossett described as "the older house south of the residence." Chief Dossett explained this was an apparently abandoned house and the reason for entry was the search for Mr. King. Chief Dossett and his officers found the old house empty and proceeded to the main house looking for Mr. King.

Chief Dossett testified that the King residence was a mobile home, "the best I remember." He believes the structure only had one entrance. The Bean Station team entered the front door of the mobile home, but did not find anyone inside. Chief Dossett testified, "We did see some weapons in plain view; I don't recall where because I was not making an inventory."

Chief Dossett explained the role of his team was to find the defendant and secure the location. When asked whether there was anyone else inside the trailer, Chief Dossett testified that he does not think so. Chief Dossett made an effort to recall where the guns were located inside the trailer, and testified that "maybe they were in a bedroom off to the right." Chief Dossett said

that to the best he could remember, the guns may have been in a gun rack or cabinet that may have had a glass front.

Chief Dossett testified no one else (besides the law enforcement officers) was in the residence. He and his team stayed in the room "until we got the investigator" because they did not want to leave any guns unsecured. They did secure the guns. Chief Dossett stated that he did not do an inventory and described that "the best I recall, they were long guns." Chief Dossett said that he did not have any discussions with family members after he left the house, nor did he get further information about the defendant's whereabouts. Chief Dossett recalled there may have been some speculation that Mr. King might be in the nearby woods. At that point, the Bean Station swat team and Chief Dossett left the scene, their task completed.

## II. Cross-Examination

Attorney Voss cross-examined Chief Dossett. The Chief testified that it was after dark when his team arrived at the scene to check the residence at the request of the Sheriff's Office. They assembled down the roadway east of the house. Chief Dossett estimated the distance between the house and the roadway at about 300 feet. The terrain was mostly open, but there was a wooded area behind the house and on the side to the east. Chief Dossett did not see anyone at the trailer, nor did he see signs of movement in the woods.

Chief Dossett testified that he did not believe anyone was looking in the woods for Mr. King. He testified that no one on his team called out on a megaphone or loudspeaker to see if Mr. King would come out voluntarily, and he does not recall anyone else doing so while he was present.

Chief Dossett said that when he and his team arrived, he was told the occupant had stabbed someone and fired some shots. When asked whether he ever saw the arrest warrant that had been discussed, Chief Dossett responded, "not a hard copy." He was told it was signed, but did not actually see it.

Chief Dossett confirmed his understanding that his team was the first to enter the mobile home. When asked whether any other officer had been in the house first, Chief Dossett testified, "not that we were told." Chief Dossett testified that he himself was the first of the swat team to enter the mobile home. They went in through the front door, into a living room. From there, Chief Dossett testified, "I believe I went right." He testified they looked in bedrooms, under beds and in closets, as their focus was to find a person.

Finding no one, Chief Dossett testified that he and his team stayed just until they could turn the scene over to the investigators. The officers testified that no one was in the trailer and that guns were in the gun cabinet. Investigators then came in and saw the guns. Attorney Voss asked whether the other officers, the Grainger County Sheriff's officers, knew there was no one else inside the trailer when they came in, Chief Dossett replied, "Right." When asked whether there were guns lying out on a bed, he responded, "not that I recall." Chief Dossett likewise responded in the negative when asked whether there were guns out on the kitchen table.

The Court inquired of this witness whether he could remember anyone at the scene. Chief Dossett responded that he remembered Jason Johnson, who was outside, and Holt. Chief Dossett could not remember whether Officer Holt went inside the trailer. Chief Dossett told the Court, "We were just there to serve the warrant." Chief Dossett explained to the Court, "I didn't actually see the hard copy of the warrant; we were told it had been signed."

### C. Tammy King

I: <u>Direct Examination</u>

*A. Arrival of the Police*

Following the close of the government's proof, the defendant's wife, Tammy King, testified. Mrs. King testified that five family members resided in the trailer at 4283 Rutledge Pike on April 23, 2005: her mother-in-law Arlene; her brother-in-law Ronald Trosper; her husband Murphy King, their son and herself. All were home on the evening in question. Referring to April 23, 2005, Attorney Voss asked Mrs. King who left the trailer and why they left. Mrs. King testified that Joey left and went up in a field. Murphy Joseph King goes by "Joey King." She confirmed Ronnie Tropser left and there had been an argument. Afterward, Arlene left. Mrs. King testified that Arlene "never did come back," but that later Mrs. King looked out the window and saw "a bunch of cops."

*B. Ronnie Manis*

Mrs. King remained inside the trailer with her son for about two hours after seeing the police. Mrs. King testified that after two hours, "Ronnie Manis came in and told me to get two jackets and come on." Mrs. King testified that Officer Manis is with the Sheriff's Office and that he came in through the front door into the living room with a shotgun in his hand. Officer Manis was not pointing the shotgun at anyone and did not seem concerned for anyone's safety, said Mrs. King.

Mrs. King did as she was instructed, retrieving a jacket for her son and one for herself from a closet. Mrs. King and her son followed Officer Manis out of their house, across the property to a fence, which they crossed and went to the neighbor's driveway. In response to

inquiry by another officer whom Mrs. King recognized as Stephanie Johnson of the Grainger County Sheriff's Office, Officer Manis reported, "I already got the juvenile and the adult female." Mrs. King and her son were instructed to wait in the backseat of Officer Manis cruiser, which they did. She stated she was asked if Joey King was in the trailer and told Officer Holt that he was not. She and her son were put in the back of a car.

## C. Afterward

Mrs. King testified that the police took a number of items from the King residence that night, to include the guns, a briefcase with important papers, a pocket knife and some silver coins. Mrs. King testified that "on Monday I went to talk to (Sheriff) Duris Williams, "and "asked for the warrant." Mrs. King testified that the Sheriff responded that he didn't have one, "we don't need a warrant, we had probable cause." Mrs. King further testified that the Kings never received an inventory of the items seized from their home April 23, 2005. Mrs. King testified that the guns found in the house belong to her son, Joseph Lee King, age 11.

## II: Cross-Examination

Mrs. King was cross-examined by AUSA Tracy Stone. On cross-examination, Mrs. King testified that she never saw her husband leave with a gun, or leave without a gun. Mrs. King gave a specific and detailed account of the acquisition of each of the five guns, as follows:

First, Mrs. King testified that she and her mother-in-law, Arlene, bought Joseph a .410 shotgun from the East Town Wal-Mart store in Knoxville for his ninth birthday. Mrs. King testified the next gun, a .12 gauge shotgun, was purchased for Joseph at K-Mart on north Broadway in Knoxville. This gun was a Christmas gift for Joseph when he was 10 years old.

Mrs. King then testified about a 30/30 rifle and a 12 gauge shotgun bought for Joseph when he was nine tears old.  That gun was purchased by Mrs. King's mother-in-law from Mrs. King's cousin, Leon Sands of Dunville Gap Road.  Mrs. King testified that her mother-in-law has a written receipt for the gun.  Joseph later traded the 30 / 30 with a boy from school, Jacob Capps of Washburn.  The boys attended Joppa Middle School together.  The gun traded away was a second 30 / 30 that Mrs. King's mother-in-law had given Joseph; a gun that someone had given to her.  In receipt of the trade, Joseph got an SKS rifle.  Mrs. King testified that this SKS rifle has no magazine clip, but holds four or five bullets at a time.  She said that it shoots one shot at a time.

When asked where the guns were kept, Mrs. King testified, "In a gun cabinet in our bedroom," and indicated that she, her husband and their son all slept in the same room.  Mrs. King testified that there was ammunition stored in the bedroom as well and that all the guns were stored loaded in a locked cabinet that had a glass front.

Returning to the events leading to the search, Mrs. King testified that her husband and his brother were fighting inside the mobile home.  However, Mrs. King stated that she did not see the fight because she was in her bedroom with the door closed.  However, she did testify her husband had no gun that day.  When Mrs. King heard glass break, she looked out the bedroom door and saw Ronnie Trosper's nose bleeding and her husband's mouth was bleeding.  She testified that Mr. Trosper then left the house.  Mr. Trosper then returned to the house and Mr. King left.  Mrs. King testified that she and her husband have never discussed the fight, explaining that it was "a fight between brothers."

Mrs. King testified that her husband was ultimately arrested for the assault on Mr. Trosper and tried before a jury on that charge and was acquitted.  Mrs. King testified that her

husband had also been charged with the state offense of being a felon in possession of a firearm, but that charge was "dropped."

Mrs. King was asked how she recognized Officer Manis on April 23, 2005. Mrs. King explained that she had been a substitute teacher at Rutledge Elementary where Officer Manis worked; Mrs. King spelled his last name for the court reporter. Mrs. King confirmed that Officer Manis came into the trailer alone, he came all the way into the trailer, and he had a shotgun in his hand. Mrs. King testified that when Officer Manis came into the house, she was in the kitchen. The door was not standing open, but Mrs. King said she did not hear a knock at the door. Mrs. King testified that Officer Manis did not conduct a search; she and her son just got their jackets and went with him as directed. Mrs. King told the police that her husband was not inside the trailer. When asked by AUSA Stone, "do you blame the officers for not necessarily taking your word for that?" Mrs. King responded, "No, that's just their job."

After the conclusion of Mrs. King's testimony, the defense rested and argument by counsel was heard. As argument proceeded, AUSA Stone located a copy of the inventory of the search and brought this to the Court's attention. Attorney Voss informed the Court that this was the first she was aware that there was an inventory; AUSA Stone told the Court that the inventory was certainly with the materials he had asked to be copied and provided to defense counsel, and that its omission from the discovery material was inadvertent. AUSA Stone offered to provide a copy immediately after the hearing and the document entitled "property receipt" was introduced as Exhibit 6 to the hearing. During argument, the government asked to recall Mrs. King to the stand, having failed to address one point on cross-examination.

When Mrs. King was recalled, the government asked whether she remembered telling the officers on April 23, 2005, that she had heard gunshots. Mrs. King testified that she did recall telling the officers that she had heard some faint gunshots, but that she assigned them no importance because her son was playing a video game, Grand Theft Auto, that had gunshot sound effects and also the Kings' neighbor regularly shoots guns. Mrs. King's statement given to police the night of April 23, 2005, was introduced as Exhibit 7.

## II. LAW AND ANALYSIS

### A. Standing

#### I: Positions of the Parties

Neither party fully addressed the issue of whether Mr. King has standing to contest the seizure of the guns in question and their use as evidence in his trial. The issue did arise briefly in the closing remarks of counsel, however. At that point, the government observed that Mr. King had disavowed any ownership of the guns in question and may have defeated his own standing to raise a Fourth Amendment challenge. Counsel for Mr. King responded that the defendant need not claim ownership of the guns before he may challenge a search of his house.

#### II: Findings of Fact and Conclusions of Law

Only a person whose Fourth Amendment rights have been violated may contest the admission against him of the evidentiary fruits of the violation. Rakas v. Illinois, 439 U.S. 128 (1978). The proof at the hearing established that the seizure of the guns took place as a consequence of the officers' entry into the house, a search. The Supreme Court has long recognized that "a man's home is his castle" and, specifically, that such a right to be secure from

intrusion is embodied by the Fourth Amendment. <u>Minnesota v. Carter</u>, 525 U.S. 83, 94 (1998) (Scalia, J., concurring) (emphasis omitted); see <u>United States v. Nelson</u>, 459 F.2d 884, 885 (6th Cir.1972) (noting that the Fourth Amendment exists to ensure the inviolability of an individual's home).

Mr. King had an expectation of privacy in his home, which was the place searched. This relationship to the place searched conveys standing to Mr. King to challenge the instant search and the admission of its fruits into evidence at his criminal trial, even though he has denied ownership of the guns themselves.

## B. Was There an Arrest Warrant for Mr. King at the Time the Officers Entered his House?

The parties agreed that at the time the pretrial motions were filed, it appeared the government could not produce an arrest warrant for Murphy King issued on the night in question. An arrest warrant was produced only a few days before the hearing. AUSA Stone explained that he had made efforts to get a copy of the warrant for some period of time, that the clerk of the court did not have the warrant, a copy of the warrant or any record of the warrant. Likewise, the Grainger County Sheriff's Office could not produce any record of the warrant whatsoever. AUSA Stone explained, by means of proffer, that he finally reached Captain Johnson, the criminal investigator who had handled the case for the Grainger County Sheriff. Capt. Johnson, no longer with the department, had vacated his office and in doing so he took all his files along with him. Capt. Johnson reported that he had Officer Holt's original arrest warrant in his file, at his home. While he would not agree to meet with AUSA Stone to provide the arrest warrant, he was eventually persuaded to send a copy by fax to the clerk of the court, which he evidently did.

This faxed copy of the original arrest warrant from a former investigator's personal papers is all the documentation before the Court of an arrest warrant.

Counsel for Mr. King argued that the document before the Court was not reliable and that its authenticity could not be established. AUSA Stone could offer only the document he had available and the testimony of Officer Holt in support of the existence of this arrest warrant. While this erstwhile arrest warrant may not have provided adequate proof of the existence of an arrest warrant on the night of the search, the Court finds that it serves to corroborate the testimony of Officer Holt. Officer Holt testified in great detail about obtaining the arrest warrant, including descriptions of his conversations with the Sheriff during the process, his position in Ms Reagan's home as she reviewed the warrant and the distance he traveled. He also identified the proffered arrest warrant, Exhibit 2, as an accurate copy of the one he prepared and got signed on April 23, 2005. The Court finds Officer Holt to be a credible witness and finds that there was a valid arrest warrant at the time of the officers' entry into Mr. King's home. Because there was a felony arrest warrant for Mr. King, the officers went inside the residence to search for him.

### C. Did the Arrest Warrant Authorize Police to Enter Mr. King's House and Authorize Them to Conduct a Protective Sweep?

An arrest warrant based on a finding of probable cause validates the officers' entry into Mr. King's house in this case. Payton v. New York, 445 U.S. 573, 603 (1980). As observed by the Supreme Court, the most common situation in which Fourth Amendment issues have arisen has been that in which the police enter the suspect's premises, arrest him, and then carry out a warrantless search and seizure of evidence. Coolidge v. New Hampshire, 403 U.S. 443, 475 (1971). Here, the officers entered the house and looked for Mr. King.

"When officers have obtained an arrest warrant and they have reason to believe the suspect is in the house, they may search anywhere that the suspect might reasonably be found." United States v. Stover, 474 F.3d 904 (6th Cir. 2007), citing Maryland v. Buie, 494 U.S. 325 (1990).  In Buie, the Supreme Court articulated a limited exception to this general rule, authorizing officers making arrests in the home to conduct a "protective sweep" – a "quick and limited search of the premises, incident to an arrest and conducted to protect the safety of the police officers and others."  Buie, 494 U.S. at 327.

> The Buie Court articulated two holdings: First, during a search incident to an arrest occurring inside a home, officers may "as a precautionary matter and without probable cause or reasonable suspicion, look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched." Second, officers may conduct a search more pervasive in scope when they have "articulable facts which taken together with the rational inferences from those facts would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene."
>
> Stover, 474 F.3d at 911 (quoting Buie, 494 U.S. at 334).

The Buie case holds that reasonable suspicion, or reasonable belief, rather than probable cause, is all that is needed to support a protective sweep while an arrest is in progress.  (See Justice Stevens' opening line in his concurrence, Buie, 494 U.S. at 337; see also United States v. Pruitt, 458 U.S. F.3d 477 (6th Cir. 2006)).

Here, the officers had obtained a valid arrest warrant.  They also had reasonable suspicion to conduct a protective sweep as they had reason to believe the suspect, Mr. King, was inside the house.  This was based on the fact that the named victim had reported he had been shot at, and reported what kinds of guns Mr. King had and which one he had used to shoot at the victim.  The victim reported being shot at, while at the defendant's residence and was found in the defendant's

driveway.  The victim had also reported to the E-911 operator that Mr. King was still shooting at that time, was drunk, and was still inside the house.  Upon Officer Holt's arrival, he found the victim holding his side and bleeding quite a bit.  The victim told Officer Holt that he had been stabbed and shot at by Mr. King, and his condition tended to corroborate his statements.  The Sheriff called in the local swat team out of concern the shooter was still inside the house with a high-powered rifle (an SKS, as reported by the victim).[1]  They set up a perimeter and no one saw anyone leave (although the defendant's wife indicated that Officer Manis ferried her and her son out before the entry).  Chief Dossett, while not using the term "protective sweep," testified to facts that essentially describe such an action.  He clearly stated they were searching for the shooter, Mr. King, and that they looked in bedrooms, closets and under beds as their focus was to find a person.[2]  Thus the officers, in executing the arrest warrant had more than, and articulated more than, reasonable suspicion to conduct a protective sweep in searching for Mr. King.

---

1 Although Mrs. King testified that she told Officer Holt that her husband was not inside the house, the Court finds her testimony in conflict with Officer Holt's and Chief Dossett's and gives more credibility to the officers' testimony on this point.  The Court further finds Mrs. King's overall testimony and her testimony regarding the hearing of faint gunshots as less credible on these issues.  Finally, the officers had no reason to believe Mrs. King, and she conceded as much.

2 Although Officer Holt testified at one point they were looking for guns, he was not the person responsible for initiating or preparing for the entry into the house to arrest and/or search for the defendant, and he was not on the initial entry team, nor did he authorize the entry.  As such, Chief Dossett's testimony regarding the nature of the protective sweep is more credible and accurate on this point.  However, to the extent Officer Holt believed and/or expected that such weapons would be found during the entry such does not invalidate the seizure.  This was precisely the issue and holding in Horton, infra at 24, which did away with the inadvertence requirement of the "plain view" doctrine.

They did not find him within, but they did see firearms during their search for Mr. King.[3] The question then becomes whether, after reasonable entry to serve a felony arrest warrant, the seizure of those firearms was legitimate.

### D.  Did the Plain View Doctrine Authorize the Police to Seize the Guns?

I:  <u>Positions of the Parties</u>

*A.  Mr. King*

Mr. King's position is that the police seizure of guns found inside his house violated his Fourth Amendment right to be free from unreasonable searches and seizures.  Mr. King argues the plain view doctrine is not applicable in this case because the officers were not lawfully located in a place from where the objects could be seen when they spotted the guns and, further, that the incriminating nature of the guns was not immediately apparent. <u>Horton v. California</u>, 496 U.S. 128 (1990).

*B.  Government*

The government's position is that the officers were lawfully inside the house in an effort to serve a felony arrest warrant for aggravated assault when they observed guns.  The officers were also aware that the victim had reported Mr. King shooting at him, also an aggravated assault.  The government argued that Chief Dossett was in a lawful position to view the guns while assisting

---

3 The government argues, alternatively, that exigent circumstances supported the officers' entry into the house.  The government asserts that because Mr. King posed a threat to public safety and the safety of the investigating officers, law enforcement officers were justified in entering to look for the shooter.  Finding there was a valid arrest warrant, the Court need not reach this issue.

other officers in serving a valid felony arrest warrant. The government submits that all of the plain view requirements were met in this case.

## II: <u>Law</u>

Exceptions to the warrant requirement abound in Supreme Court case law, as listed by the Sixth Circuit these include: 1) the "automobile exception," <u>Carroll v. United States</u>, 267 U.S. 132 (1925); 2) search incident to arrest, <u>Chimel v. California</u>, 395 U.S. 752, (1969); 3) "inventory" searches, <u>Illinois v. Lafayette</u>, 462 U.S. 640 (1983); 4) "hot pursuit," <u>Hayden</u>, 387 U.S. 294; 5) "stop and frisk," <u>Terry v. Ohio</u>, 392 U.S. 1 (1968); 6) "border searches," <u>United States v. Montoya de Hernandez</u>, 473 U.S. 531 (1985); 7) "plain view," <u>Coolidge</u>, 403 U.S. 443; 8) "school searches," <u>New Jersey v. T.L.O.</u>, 469 U.S. 325 (1985); 9) "consent searches," <u>United States v. Mendenhall</u>, 446 U.S. 544 (1980); and 10) "administrative searches," <u>Donovan v. Dewey</u>, 452 U.S. 594 (1981). <u>O'Brien v. City of Grand Rapids</u>, 23 F.3d 990, 997 (6th Cir.1994).

The government relies here upon the plain view doctrine as an exception justifying the seizure of the guns absent a warrant. The Supreme Court has articulated two principal requirements for a valid plain view search: first, the incriminating nature of the item in plain view must be immediately apparent, and second, the officer must be lawfully located in a position from which he or she can plainly see the item and have lawful access to it. <u>United States v. Bradshaw</u>, 102 F.3d 204, 211 (6th Cir. 1996) (applying <u>Horton v. California</u>, 496 U.S. 128, 136-37 (1990)). The officer need not come across the seized item inadvertently.[4] <u>Horton</u>, 496 U.S. at 130-31. The issues before the Court are whether Chief Dossett was in a lawful position to view the items and whether the incriminating nature of the guns was immediately apparent.

---

4 See fn.2 <u>supra</u> at 23.

## C. Findings of Fact and Conclusions of Law

Pursuant to Horton v. California, 496 U.S. 128 (1990), this Court must conduct a two-prong inquiry to assess the applicability of the plain view doctrine.

### 1. Were the officers lawfully in a position to see the guns?

If Chief Dossett was legitimately inside Mr. King's bedroom in order to assist execution of the arrest warrant, he could lawfully seize any object in plain view so long as the object's incriminating character was immediately apparent. Minnesota v. Dickerson, 508 U.S. 366 (1993); Horton v. California, 496 U.S. 128 (1990); United States v. Atchley, 474 F.3d 840, 850 (6th Cir. (2007); United States v. Bishop, 338 F.3d 623, 626 (6th Cir.2003). See e.g., United States v. Bradshaw, 102 F. 3d 204, 210-11 (6th Cir. 1996). The Supreme Court has explained that "[t]he seizure of property in plain view involves no invasion of privacy and is presumptively reasonable, assuming that there is probable cause to associate the property with criminal activity." Payton v. New York, 445 U.S. 573, 587 (1980). Generally, where the initial intrusion that brings the police within plain view of an article is supported by a warrant, the seizure is legitimate.

The Court has concluded that there was a valid arrest warrant in existence at the time Chief Dossett and his tactical team entered the King household. Chief Dossett testified that he and his team waited until they learned an arrest warrant was signed; they relied upon that authority to enter the house. The information Chief Dossett possessed was more than sufficient to support a reasonable suspicion that Mr. King was likely to be inside the house and it was not unreasonable for those officers to enter the house for the purpose of serving the warrant, and to conduct a protective sweep, which included walking into the bedrooms to check for Mr. King. The Court concludes that the officers were lawfullly in a position to see the guns.

*2.Was the incriminating nature of the guns immediately apparent?*

In United States v. Byrd, 211 F.3d 1270 (6th Cir. 2000), the Sixth Circuit has provided guidance to lower courts in determining whether an item is of an incriminating nature that is immediately apparent:

> A plain view seizure must be supported by probable cause to associate the item with criminal activity, see Hicks, 480 U.S. at 326 – 27, not any 'unduly high degree of certainty' that the phrase 'immediately apparent' might imply. See Calloway, 116 F.3d at 1133. (quoting Brown, 460 U.S. at 741). The burden of proving probable cause is on the Government. See United States v. Beal, 810 F.2d 574, 577 (6th Cir. 1987). We apply three factors, none of which is determinative, to aid in the assessment of the 'immediately apparent' criminal nature of the item. See id. (citing Beal, 810 F.2d at 576-77). First is the nexus between the item seized and the factors listed in the warrant….Second is 'whether the intrinsic nature or appearance of the seized object gives probable cause to associate it with criminal activity; and [third is] whether probable cause is the direct result of the officer's instantaneous sensory perceptions.' Calloway, 116 F.3d at 1133.

> Byrd, 211 F.3d at *3.

Chief Dossett testified that, while he could not recall with absolute certainty, he believes that he saw the guns inside a gun case or cabinet with a glass panel in front. Mrs. King also testified that the guns were kept in a gun case in the bedroom. A gun inside a case, without more, does not have an incriminating character that is immediately apparent. However, a weapon could have an incriminating character under some circumstances.

There was no evidence at the hearing that any of the officers were aware that Murphy King had been previously convicted of a felony. Thus the guns would not have been of an incriminating character as to Mr. King's instant charge of being a felon in possession of a firearm. The Court next must address whether, at the time Chief Dossett and the other officers seized the guns, they were incriminating as to another crime.

The officers were aware that the victim had reported Mr. King shooting at him, which constitutes commission of at least one felony. The fact that guns were, in fact, inside the house after a man reported being shot at from the house imbued these guns with an immediately apparent incriminating nature and were related to the very matter under investigation. The Court finds there was a nexus between the items seized and the warrant to the extent that the assault not only included a stabbing, but also shooting at the victim. Second, the guns, being the instruments of the alleged shooting were properly associated with it and it was due to the officers' instantaneous observations. The officers were entitled to seize the guns as evidence of a crime (the shooting), for identification by the victim, for ballistics testing or for other use in the prosecution of the felony aggravated assault.[5]

The Court concludes that there was a valid arrest warrant, that the officers had reason to believe the "shooter" reported by Mr. Tropser was inside the house, although he was not found there and remained on the loose. The Court further finds that the officers entered Mr. King's house in an effort to arrest him pursuant to that warrant, and that the guns were in plain view, and their incriminating character was established by Mr. Tropser's original complaint.

The Court further observes that officers may temporarily seize weapons in plain view if they reasonably believe the weapons pose an immediate threat to officer or public safety. United States v. Bishop, 338 F.3d 623, 628 (6th Cir. 2003), cert. denied, 540 U.S. 1206 (2004). Here, given the failure to locate Mr. King and the potential for an ambush or other use of the guns by the defendant on the officers (upon their exit or otherwise) permits gaining immediate control of

_____

5  The collective knowledge of the searching officers can be considered in determining whether the guns constituted evidence of a crime. See U.S. v. Poulos, 895 F.2d 1113, at fn6 1122 (6th Cir. 1990). Here the rifles, at least those described by the victim, would clearly constitute evidence of the shooting.

such weapons.  Furthermore, the officers could seize the guns based upon their safety concerns as they were dangerous in themselves.  Given the situation the officers believed they were facing (including a potentially drunk rifle shooter) a reasonable officer coming upon a collection of rifles (which Mrs. King confirmed were all loaded, and with additional ammunition in the same room) would at least temporarily seize that weapon as an immediate threat to the safety of the officers and the public.  See United States v. Flores, 193 Fed. Appx. 597, 604-5 (6th Cir. 2006).

### III.  CONCLUSION

For the foregoing reasons, the Court respectfully **RECOMMENDS** that defendant Murphy King's Motion to Suppress Evidence **[Doc.  9 ]** be **DENIED**.[6]

Respectfully submitted,

s/ C. Clifford Shirley, Jr.
United States Magistrate Judge

---

[6] Any objections to this Report and Recommendation must be served and filed with the clerk of the court within ten (10) days after service of a copy of this recommended disposition on the objecting party.  Such objections must conform to the requirements of Rule 72(b), Fed. R. Civ. P.  Failure to file objections within the time specified waives the right to appeal the District Court's order.  Thomas v. Arn, 474 U.S. 140 (1985).  The District Court need not provide de novo review where objections to this report and recommendation are frivolous, conclusive, or general.  Mira v. Marshall, 806 F.2d 636, 637 (6th Cir. 1986).  Only specific objections are reserved for appellate review.  Smith v. Detroit Federation of Teachers, 829 F.2d 1370, 1373 (6th Cir. 1987).